United States District Court
Southern District of Texas
FILED

MAY 1 6 2002

Michael N. Milby
Clerk of Court

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **FRANCISCO SANCHEZ** | § | |
| | § | |
| **v.** | § | |
| | § | **CIVIL ACTION NO. B-02-066** |
| **AMERICAN HOME PRODUCTS** | § | |
| **CORPORATION, ET. AL.** | § | |

### DEFENDANT NOVARTIS CONSUMER HEALTH, INC.'S REPLY
### TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO STAY

TO:    THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, BROWNSVILLE DIVISION

Defendant Novartis Consumer Health, Inc. files its reply to Plaintiff Francisco Sanchez's response to Defendant's Motion for Temporary Stay of Proceedings.

1.    In its motion to stay, Defendant moved this Court to stay this phenylpropanolamine ("PPA") proceeding until the judicial panel ("the Panel") on multidistrict litigation ("MDL") acts on its tag-along notice that this case should be transferred to *In re Phenylpropanolamine ("PPA") Products Liability Litigation*, MDL Docket No. 1407, 173 F. Supp. 2d 1377 (J.P.M.L. 2001).

2.    In his response, Plaintiff does not dispute that the instant case may qualify for PPA MDL treatment. Rather than stay the proceeding, however, Plaintiff contends that this Court should wait on his future motion for remand and address that motion first. Plaintiff's position neglects several important factors.

3.    First, Plaintiff disregards the MDL Panel's previous conclusion that numerous

1

pending PPA proceedings "involve common questions of fact, and that centralization under Section 1407 in the Western District of Washington will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation." *In re Phenylpropanolamine ("PPA") Prods. Liab. Litig.*, 173 F. Supp. 2d at 1379. The Panel observed that these PPA cases "remain rooted in complex core questions concerning the safety of" PPA. Id. The Panel also anticipated "tag-along" PPA actions, such as the one in the instant case. *See id.* at 1379 n.1.

4.      Plaintiff also overlooks the plethora of authorities supporting Defendant's position. In addition to copious decisions citing general legal principles that validate a stay, Defendant included numerous orders from other federal district courts that have addressed this issue in other PPA proceedings and concluded that stays were warranted.

5.      Plaintiff, on the other hand, offered only one PPA decision to the contrary. In that proceeding, a Louisiana court refused to wait on the Panel and ruled on the pending motion to remand. That opinion, however, carries minimal weight at best. As this Court may recall, the Defendants attached more than 60 orders from Louisiana courts staying PPA cases pending a final ruling from the MDL Panel. (Defendant's Motion to Stay, Maple Chase F). Subsequent decisions have reached the same conclusion.

6.      Following the majority, another Louisiana court recently stayed a pending PPA proceeding. (Exhibit A). The Louisiana court's order was issued out of same district as Plaintiff' sole PPA authority.

7.      In addition, a federal district court in Texas recently arrived at the same conclusion

2

in *Angela Dille, et al. v. The Delaco Company, et al.,* Civil Action No. SA 02 CA0274, In the United States District Court for the Western District of Texas, San Antonio Division.  (Exhibit B).  A similar order was entered in *Hilton-Caine, et al. v. Whitehall-Robins Health Care, a division of American Home Products Corporation, et al.,* Civil Action No. H-02-1029, In the United States District Court for the Southern District of Texas, Houston Division.  (Exhibit C).  In *Hilton-Caine,* all parties agreed to the stay.

      8.    All these orders in PPA cases, coupled with general legal principles, establish that, although this Court may rule on a future motion to remand, the better course is to refrain from doing so and stay the entire proceeding.  The law certainly does not support Plaintiff's representation that it is this Court's "duty" to rule on his forthcoming motion to remand.  (Plaintiffs' Response, p. 2).

      9.    As set forth more fully in the Defendant's motion, a stay is particularly compelling where, as here, there are common legal issues in the actions being considered for MDL treatment. In addition, this approach conserves judicial resources.

      10.    A stay also protects against the risk of inconsistent decisions on jurisdictional disputes, which can be a recurring problem in PPA actions and certainly is in the numerous PPA lawsuits that have been filed against Defendant in this case.  *See, e.g., Ivy v. Diamond Shamrock Chem. Co.,* 901 F.2d 7, 9 (2d Cir. 1990)(affirming panel's rejection of plaintiffs' request that transferor court decide remand motion; "[t]he jurisdictional issue in question is easily capable of arising in hundreds or even thousands of cases in district courts throughout the nation," and "[c]onsistency as well as economy is thus served" if "the jurisdictional objections . . . [are] heard and resolved by a single court").  This need for consistency in pre-trial proceedings is great, particularly

3

where fraudulent joinder issues are present, as they are here.  *See e.g.*, *In re Fed. Elec. Campaign Act Litig.*, 511 F. Supp. 821, 824 (J.P.M.L. 1979)("Transfer under Section 1407 at the present time will permit a single judge to consider [remand] motions and thus will have the salutary effect of promoting judicial economy and avoiding inconsistent adjudications regarding this particular issue"); *Boudreaux v. Metropolitan Life Ins. Co.*, Civ.A.No. 95-138, 1995 WL 83788 at *2 (E.D. La. 1995) (granting a stay to prevent the litigation of jurisdictional issues in multiple district courts and to eliminate the possibility of conflicting results).

11.    Also, one forum is more convenient for the parties, their attorneys, and witnesses, which frequently will involve identical individuals.  Finally, a brief stay will not prejudice Plaintiff. Defendant discussed this situation in more detail in its motion to stay as well as the resulting prejudice to it if this Court refuses to stay the case.  Plaintiff never challenged these contentions.

12.    The importance of a stay in this instance cannot be emphasized enough, particularly because  the likelihood of this proceeding being transferred is significant.  The Panel already has issued 12 orders that conditionally transfer over 350 PPA cases to the Western District of Washington. (*See* Defendant's Motion to Stay, Exhibit A).  Many of these conditional transfers have become final, and the PPA court has been ruling on remand motions in these cases.

13.    The law is clear that, "[t]he *general rule* is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [Judicial Panel] has transferred the case. . . ." *Jackson v. Johnson & Johnson, Inc.*, No. 01-2113, slip op. at 11 (W.D. Tenn. Apr. 3, 2001) (emphasis added). (Defendant's Motion to Stay, Exhibit N).  This Court should do the same and stay this case until the Panel makes a decision.

4

## Conclusion

This Court should grant the Defendant's motion for a temporary stay of proceedings pending the Panel's final ruling on transferring this case to MDL-1407. All pretrial proceedings, including, but not limited to, all motions, hearings, disclosures, and deadlines should be stayed.

Respectfully submitted,

RODRIGUEZ, COLVIN &
CHANEY, L.L.P.
1201 E. Van Buren
Brownsville, TX 78520
956-542-7441 Telephone
956-541-2170 Facsimile

By: _____
    Mitchell C. Chaney
    State Bar No. 04107500
    Federal I.D. 1918
    Teri L. Danish
    State Bar No. 05375320
    Federal I.D. 12862

Michael D. Robbins
Stephen H. Lee
DOYLE RESTREPO HARVIN &
ROBBINS LLP
600 Travis, Suite 4700
Houston, TX 77002
713- 228-5100 Telephone
713-228-6138 Facsimile

Richard L. Josephson
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, Texas 77002-4995
(713) 229-1460 Telephone
(713) 228-6138 Facsimile

61981

5

Earl B. Austin
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6542 Telephone
(214) 661-6542 Facsimile

*ATTORNEYS FOR DEFENDANT*
*NOVARTIS CONSUMER HEALTH, INC.*

Randolph S. Sherman
Lori B. Leskin
Danielle E. Finck
**KAYE SCHOLER, L.L.P.**
425 Park Avenue
New York, New York 10022

*Of Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been delivered to the following counsel of record by facsimile, certified mail, return receipt requested, or by regular mail on this *16* day of May, 2002.

*By Regular Mail*

Brynley James
Fulbright & Jaworski, L.L.P.
300 Convent Street, Suite 2200
San Antonio, TX 78205-3792

Brian P. Johnson
Frank Doyle
Hanen, Johnson
& Spalding, LLP
910 Travis, Ste. 1700
Houston, TX 77002

J. Mark Jones
David E. Dukes
James F. Rogers
Kennan Building, Third Floor
1330 Lady Street

Margaret Brenner
Hays, McConn, Rice & Pickering
400 Two Allen Center
1200 Smith Center
Houston, TX 77002

61981                                   6

Columbia, SC 29201

Alan Vickery
Sedgwick, Detert, Moran & Arnold
1717 Main Street, Suite 5400
Dallas, TX 75201

Tony Canales
Canales & Simonson
2601 Morgan Avenue
P.O. Box 5624
Corpus Christi, TX 78465-5624

Ken Ferguson
Michael Klatt
Kelly Kimbrough
Clark, Thomas & Winters
P.O. Box 1148
Austin, TX 78767

Ana Lisa Garza
Ramirez & Garza, L.L.P.
509 N. San Antonio Street
Rio Grande City, TX 78582

Keith R. Taunton
Tucker, Taunton, Snyder & Slade
Eight Greenway Plaza, Suite 1200
Houston, TX 77046

D. Joseph Hurson
Lane Powell Spears Lubersky, LLP
1420 Fifth Avenue
Suite 4100
Seattle, WA 10022-3298

Robert M. Schick
Vinson & Elkins, L.L.P.
2300 First City Tower
1001 Fannin Street
Houston, Texas 77002-6760

Danielle Finck
Lori Leskin
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022-3298

Crisanta Guerra Lozano
Roerig, Oliviera & Fisher
555 W. Price Rd., Suite 9
Brownsville, TX 78520

Brent Kugler
Daniel Sheehan & Associates, L.L.P.
Chase Tower, 2200 Ross Avenue, Suite 3060
Dallas, Texas 75201

James Williams
Miller & Martin
Suite 1000 Volunteer Bldg.
832 Georgia Avenue
Chattanooga, TN 37402-2289

Kenneth C. Baker
The Baker Law Firm
12600 Featherwood, Suite 225
Houston, TX 77034

Terry O. Tottenham
Lana K. Varney
Fulbright & Jaworski, L.L.P.
600 Congress Avenue., Suite 2400
Austin, Texas 78701

61981

*By Certified Mail,*
*Return Receipt Requested*

Nelda Talamantes
Ron C. Eddins
David C. Greenstone
C. Andrew Waters
Peter A. Kraus
Waters & Kraus, L.L.P.
3219 McKinney Avenue, Suite 3000
Dallas, TX  75204

Frank Costilla
Law Offices of Frank Costilla
5 E. Elizabeth Street
Brownsville, TX  78523

Mitchell C. Chaney

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2002 APR 26  AM 10: 21

LORETTA G. WHYTE
CLERK

MINUTE ENTRY
ZAINEY, J.
APRIL 24, 2002

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

GLORIA CAGE                              CIVIL ACTION

VERSUS                                   NO. 02-772

WHITEHALL-ROBINS HEALTHCARE, ET AL.      SECTION "A"(1)

Before the Court is a Motion to Remand (Rec. Doc. 8) filed
by plaintiff Gloria Cage and a Motion for Temporary Stay (Rec.
Doc. 18) filed by defendants Wyeth and Chattem,[1]  The motion for
remand, set for expedited hearing on April 17, 2002, is before
the Court on the briefs without oral argument.  The motion for
stay, set for expedited hearing on April 24, 2002, is also before
the Court on the briefs.  Both motions are opposed.

Plaintiff originally filed this suit in state court alleging

_____

[1] Another Motion for Stay (Rec. Doc. 11) on behalf of
Novartis has also been filed into the record and is set for
hearing on May 8, 2002.

DATE OF ENTRY
APR 2 5 2002




2002CI02108

CAUSE NO. _____

4

ANGELITA DILLE;
TERESA HINOJOSA;
EVER HINOJOSA;
VICKIE CHILDRESS;
MARIE FELPS;

02 FEB 11    IN THE DISTRICT COURT

Plaintiffs,

150th

VS.

___ JUDICIAL DISTRICT

THE DELACO COMPANY f/k/a THOMPSON
MEDICAL COMPANY, INC.;
CHATTEM, INC.;
H. E. BUTT GROCERY COMPANY,
INDIVIDUALLY and D/B/A H.E.B., D/B/A
H.E.B., D/B/A RX EXPRESS, D/B/A H.E.B.
CENTRAL MARKET, D/B/A H.E.B. FOOD
STORES, and D/B/A H.E.B. MARKETPLACE;
COLEMAN PHARMACY;

SENT TO CLIENTS

Defendants.

BEXAR COUNTY, TEXAS

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Now come ANGELITA DILLE, TERESA HINOJOSA, EVER HINOJOSA, VICKIE

CHILDRESS, MARIE FELPS, Plaintiffs herein, and file this Original Petition complaining of

THE DELACO COMPANY F/K/A THOMPSON MEDICAL COMPANY, INC.,

CHATTEM, INC., H.E. BUTT GROCERY COMPANY, INDIVIDUALLY AND D/B/A

H.E.B., D/B/A H.E.B., RX EXPRESS, D/B/A H.E.B. CENTRAL MARKET, D/B/A H.E.B.

FOOD STORES, AND D/B/A H.E.B. MARKETPLACE, AND COLEMAN PHARMACY

Defendants herein, and for cause of action respectfully show the Court as follows:

## PARTIES

1.    Plaintiff, ANGELITA DILLE, is over the age of 21 years and is a resident of San Antonio, Bexar County, Texas. Angelita Dille suffered a large hemorrhagic stroke on the left side of her brain on or about august 12, 1998, within 12 hours of taking Dexatrim, an appetite suppressant. Angelita Dille purchased the Dexatrim at a H.E. Butt grocery store in San Antonio, Texas.

2.    Plaintiff, TERESA HINOJOSA, is over the age of 21 years and is a resident of Laredo, Webb County, Texas. Teresa Hinojosa sustained an intracerebral hemorrhage from an arterial venous malformation on or about September 17, 1998, within twelve hours of taking Dexatrim, an appetite suppressant. Teresa Hinojosa purchased the Dexatrim at Coleman's Pharmacy in Dimmit, Texas. At all times relevant hereto, Teresa Hinojosa is and was lawfully married to Ever Hinojosa.

3.    Plaintiff, EVER HINOJOSA, is over the age of 21 years and is a resident of Laredo, Webb County, Texas. At all times material hereto, he was the lawful husband of Teresa Hinojosa.

4.    Plaintiff, VICKIE CHILDRESS, is over the age of 21 years and is a resident of San Antonio, Bexar County, Texas. Vickie Childress suffered an ischemic infarct of the right basal ganglia on or about February 9, 1998, within twelve hours of taking Dexatrim, an appetite suppressant. Vickie Childress purchased the Dexatrim at H.E. Butt grocery store in San Antonio, Texas.

5.    Plaintiff, MARIE FELPS, is over the age of 21 years and is a resident of Cedar Park, Williamson County, Texas. Marie Felps suffered an intracerebral hematoma of the left

Plaintiffs' Original Petition                                                      Page 2

basal ganglia on or about March 20, 1997, within twelve hours of taking Dexatrim, an appetite suppressant.

6.    Defendant, THE DELACO COMPANY, is the successor by merger to THOMPSON MEDICAL COMPANY, INC., which was a corporation of the state of New York, with its principal place of business in West Palm Beach, Florida. At all relevant times herein, Thompson Medical Company was in the business of promoting, manufacturing and distributing Dexatrim products containing Phenylpropanolamine ("PPA"). Defendant did business in Texas and at all relevant times hereto, marketed, promoted, warranted and sold its products containing PPA in Texas.

THE DELACO COMPANY f/k/a THOMPSON MEDICAL COMPANY, INC., is not registered in Texas and may be served with process by serving to the corporate office in person or by certified mail return receipt requested to The Delaco Company/Thompson Medical Company, 777 S. Flagler Dr., West Tower 1500, West Palm Beach, Florida 33401. Service is requested by private process.

7.    Defendant, Chattem, Inc., is believed to have purchased the Dexatrim product line from Thompson Medical Company in December 1998. Chattem is a corporation of the state of Tennessee, with its principal place of business in Chattanooga, Tennessee. At all relevant times herein, Chattem, Inc. was in the business of promoting, manufacturing and distributing Dexatrim products containing Phenylpropanolamine ("PPA"). Defendant does business in Texas and at all relevant times hereto, marketed, promoted, warranted and sold its products containing PPA in Texas.

CHATTEM, INC. is not registered in Texas and may be served with process by serving to the corporate office in person or by certified mail return receipt requested as

Plaintiffs' Original Petition                                                    Page 3

Fax Received @ uxHR: 05/06/2002 03:16PM  Remote ID: 212 836 ᴜᴜd9 * Pg 16/53
MAY 06 2002  4:21 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861304555  P.16

follows: Chattem, Inc., 1715 West 38th Street, Chattanooga, Tennessee, 37409. Service is
requested by private process.

8.      Defendant, H. E. BUTT GROCERY COMPANY, INDIVIDUALLY and D/B/A
H.E.B., D/B/A H.E.B. RX EXPRESS, D/B/A H.E.B. CENTRAL MARKET, D/B/A H.E.B.
FOOD STORES, and D/B/A H.E.B. MARKETPLACE, is a Texas corporation with its principal
place of business in Bexar County, Texas. At all times relevant herein, H.E.B. marketed,
promoted, distributed, sold, and warranted the Dexatrim medicines containing PPA in the State
of Texas.

H. E. BUTT GROCERY COMPANY, INDIVIDUALLY and D/B/A H.E.B., D/B/A
H.E.B. RX EXPRESS, D/B/A H.E.B. CENTRAL MARKET, D/B/A H.E.B. FOOD
STORES, and D/B/A H.E.B. MARKETPLACE is a corporation authorized to conduct
business in the State of Texas and may therefore be served with process by serving in
person or by certified mail return receipt requested to its Registered Agent as follows:
Dean Deckard, 646 South Main Avenue, San Antonio, Texas 78204. Service is requested by
private process.

9.      Defendant, Coleman Pharmacy, is a Texas business with its principal place of
business in Dimmitt, Webb County, Texas. At all times relevant herein, Coleman Market
marketed, promoted, distributed, sold, and warranted the Dexatrim product containing PPA in
the state of Texas.

Coleman Pharmacy is a Texas business and may therefore be served at its place of
business as follows: Coleman Pharmacy, 201 Northwest 2nd Street, Dimmitt, Texas 79027.
Service is requested by private process.

(THU)04. 25' 02 14:46/ST. 14:40/NO. 3561281855 P 5/28
FROM

## MISNOMER/ALTER-EGO

10.     In the event any parties are misnamed or not included herein, it is Plaintiffs' contention that such was a "misnomer" and/or such parties are/were "alter egos" of parties named herein.  Alternatively, Plaintiffs contend that such "corporate veils" should be pierced to hold such parties properly included in the interest of justice.

## VENUE/CONTROL PLAN

11.     Venue of this action is proper in the county of suit because one or more Defendants do business in Bexar County, Texas, and/or Plaintiffs reside in Bexar County, Texas and sustained injury in and reside in Bexar County, Texas.

12.     Plaintiffs intend to prosecute this matter as a Level 3 case under the applicable rules of procedure.  Plaintiffs reserve the right to alter this plan as the discovery and facts require.

## ALLEGATIONS FOR JOINDER

13.     All the plaintiffs took a formulation of Dexatrim appetite suppressant containing phenylpropanolamine manufactured and sold by the Defendants, The Delaco Company, f/k/a Thompson Medical Company, Inc. and Chattem, Inc., in the recommended dosages and for the manufacturer's recommended indications.  All the plaintiffs suffered injuries as a direct and proximate consequence of the use of Defendants' Dexatrim products.  Dexatrim medications contain phenylpropanolamine (hereinafter referred to as "PPA"), which is associated with serious injuries such as hemorrhagic strokes, ischemic strokes and ruptured aneurysms.  Plaintiffs allege that the mechanism of injury is the same in all cases, and starts with the ingestion of Dexatrim appetite suppressants containing PPA.  Plaintiffs allege that Dexatrim medications, when used as recommended by the manufacturers, are dangerous and unsafe, and therefore defective drugs.

Fax Received @ HR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 18/53
MAY 06 2002  4:22 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.18

FEB.25.2002   4:12PM   Fharmation inc                    +4298218895                    NO.955   P.8

Plaintiffs allege that Defendants failed to adequately warn them of the dangers of the foreseeable and normal use of this medicine.

14.    There are common questions of law and fact which exist in each of the claims of the Plaintiffs. The common facts are set out in this Complaint.

## FACTS

15.    At all relevant times herein, Defendants were designers, manufacturers, marketers, advertisers, distributors, and sellers of non-prescription, over-the counter pharmaceutical products, including appetite suppressant products, which contained PPA as an active ingredient.  The following products containing PPA were purposefully and regularly distributed, marketed, advertised, and sold throughout the United States and Texas by Defendants:  Dexatrim Caffeine Free Maximum Strength, Dexatrim Caffeine Free Plus Vitamins, Dexatrim Caffeine Free Extended Duration.

16.    At all times material to this action, Defendants engaged in the designing, testing, manufacturing, marketing, advertising, distributing and selling of non-prescription, pharmaceutical products, including appetite suppressant products containing Phenylpropanolamine or PPA. Defendants designed, tested, manufactured, marketed, advertised, distributed and/or sold the Dexatrim products listed above, which contained PPA.

17.    PPA is a sympathomimetic amine similar in structure and function to amphetamine and ephedrine.  It has a direct vasoconstricting effect on the human body.  A sympathomimetic drug such as PPA increases arterial blood pressure and stimulates the release of norepinephrine.

19.    For decades, Defendants have known or should have known that human consumption of sympathomimetic drugs can cause serious, life threatening adverse health effects

Plaintiffs' Original Petition                                                          Page 6

Fax Received @ DxHR: 05/06/2002 03:16PM  Remote ID: 212 836 ∞89 * Pg 19/53
MAY 06 2002  4:22 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.19

including damage to the cardiovascular and neurological systems.  Known effects associated

with the use of sympathomimetic drugs like PPA include hypertension, seizure, heart attack,

headache, hypertensive encephalopathy, agitation, psychosis, hemorrhagic stroke, ischemic

stroke, neurological problems and symptoms, cardiac problems, sudden cardiac and neurological

changes, and death.  Defendants as manufacturers and distributors of pharmaceutical products

knew of the dangers associated with the consumption of sympathomimetic drug such as PPA

and as such were fully aware of the dangers posed by the consumption of PPA.  Despite this

knowledge for years, Defendants used PPA in many non-prescription, over-the-counter appetite

suppressants.  Defendants marketed and advertised their products to the general public and to the

medical community as being safe and effective for their stated purposes.

### The FDA Regulatory History of PPA

19.    PPA was first synthesized in 1910 and was used in the early 1930s as an

alternative to ephedrine in maintaining blood pressure after surgery.  The ability of PPA to raise

arterial blood pressure is primarily due to the action of PPA on constricting blood vessels via

direct and, possibly, indirect activation of alpha-1-adrenoceptors.

20.    PPA in the United States has been used in two primary over-the-counter (OTC)

markets: as a decongestant in cough and cold products and as an appetite suppressant in diet

pills.  PPA was first used as a decongestant in 1936 and produced vasoconstriction of the

mucosal blood vessels to alleviate congestion.  PPA was first used as an appetite suppressant in

1972.

21.    In 1938, the Food and Drug Administration ("FDA") was created.  Under the

original Act (Federal Food, Drug and Cosmetic Act of 1938, now codified at 21 U.S.C. §§ 301 et

seq.), new drugs required the approval of the FDA.  Existing drugs were "grandfathered" under

(THU) 04. 25' 02 14:47/ST. 14:40/NO. 3561291355 P  8/28                    FROM

Fax Received @ DXHR: 05/06/2002 03:16PM  Remote ID: 212 836 oo89 * Pg 20/53
MAY 06 2002  4:22 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.20
FEB.25.200? 4:13PM  Fra CATTER INC          +2302103S          NO.555 P.10

the Act and thus exempted from the testing requirements of new drugs. No proof of safety was required for grandfathered drugs. Having been on the market as a decongestant since 1936, PPA was exempt from the new drug approval process.

22.    In 1962, the Drug Amendments to the Act, Pub. L. No. 87-781, 76 Stat. 780, required proof of effectiveness for all new drugs, including those approved between 1938 and 1962. The pre-1938 drugs previously "grandfathered" under the Act, such as PPA, continued their exempt status.

23.    The FDA regulates all OTC drugs, which are classified by the FDA as Category I (safe and effective); Category II (not safe and effective); or Category III (insufficient data to assess safety).

24.    In 1972, the FDA began to review OTC drugs for classification. As an OTC product marketed before 1972, PPA was allowed to continue on the market until a "final monograph" relating to the drug's category became effective. The FDA never finalized a monograph for PPA because of concerns about reports of hemorrhagic stroke associated with using this drug. PPA was never classified by the FDA as a Category I (safe and effective) OTC drug.

### PPA's Association with Risk of Hemorrhagic and Ischemic Events

25.    For more than twenty years, the OTC pharmaceutical industry, including the Defendant, has been aware of reports of hemorrhagic stroke, ruptured aneurysms, heart arrhythmia, cerebral vascular accidents, infarctions and heart attacks, associated with the use of PPA. Furthermore, published reports of PPA use associated with hypertension date back over thirty years.

(THU)04.25'02 14:47/ST. 14:40/NO. 3561291355 P 9/28                    FROM

26. Since 1979, there have been over thirty published case reports in the respected medical literature of stroke and PPA ingestion, often after the first use of the product. A number of these authors, medical authorities and medical "Watch-Dog" agencies such as Public Citizen called for the removal of PPA from the OTC market. Case reports and medical literature reviews of hemorrhagic stroke and cerebral vascular accidents after PPA exposure appearing in the scientific and medical literature include but are not limited to:

- King (1979)
- Elliot and White (1981)
- Bernstein and Diskant (1982)
- Johnson, Etter. and Reeves (1983)
- Mueller (1983)
- Pentel (1984)
- Fallis and Fisher (1985)
- Kikta (1985)
- McDowell, LeBlanc (1985)
- Stoessl, Young and Feasby (1985)
- Edwards, Russo, Harwood-Nuss (1987)
- Glick, et al (1987)
- Kase, et al (1987)
- Forman, et al (1989)
- Montalban, et al (1989)
- Chung (1998)
- Hamilton, et al (2000)
- Lake, Gallant, Masson, Miller (2000)

27. Since at least 1980, it has been recognized by the medical and scientific community that PPA can cause severe hypertension, and that at the same time, it has a direct effect on vasoconstriction of small blood vessels.

28. In 1981, an editorial in the American Journal of Medicine and the consumer group publication, Public Citizen, expressly recommended against PPA use in the OTC market because of safety risks, especially those related to hemorrhagic stroke.

Fax Received @ CvKHR: 05/06/2002 03:16PM Remote ID: 212 836 6689 * Pg 22/53
MAY 06 2002    4:23 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.22

FEB. 25. 2002   4:13PM INC    #2097103933    2041 P.12/30 F-136

29.    In 1983, the FDA determined that PPA raises blood pressure and later met with industry officials to discuss the need for more data to evaluate the safety concerns surrounding PPA and life threatening adverse reactions including hypertension and stroke.

30.    In 1984, the FDA banned the sale of products containing a combination of PPA and caffeine due to safety and health concerns.

31.    In 1985, the FDA issued a tentative final monograph for classifying OTC nasal decongestants. PPA, however, was omitted from the monograph due to safety concerns.

32.    In 1990, a review article of 142 PPA case reports concluded that the most serious adverse reactions (stroke and seizure) were caused by PPA products.

33.    Also, in 1990, a subcommittee of the U.S. House of Representatives Small Business Committee held hearings on diet drugs containing PPA. At the hearings, several scientific witnesses and one national society of physicians called for the removal of PPA from the OTC market because of safety and health concerns. After the hearings, the subcommittee's chairman, U.S. Representative Ron Wyden, wrote to the FDA expressing his concern about PPA and noting that an epidemiological study had demonstrated that PPA preparations lead all other OTC products in the number of serious and fatal adverse effects in people under 29 years of age, as well as the number of contacts with Poison Control Centers each year.

34.    Between 1969 and 1991, 29 cases of cerebral vascular incidents associated with PPA use were reported to the FDA through its spontaneous adverse event reporting system. Of these 29 reports, 22 were hemorrhagic strokes associated with PPA use. Of these strokes, 55% occurred after just one dose of the PPA product.

35.    In 1991, H. M. Jolson produced an internal report for the FDA that examined the reports of cerebral vascular stroke in the FDA spontaneous reporting system for PPA versus all

(THU) 04. 25. 02 14:48/ST. 14:40/NO. 3561291355 P 11/28
FROM

Fax Received @ UnHR: 05/06/2002 03:16PM  Remote ID: 212 836 UU9 * Pg 23/53
MAY 06 2002  4:23 PM FR KAYE SCHOLER LLP 52 836 8689 TO 51713228613804555 P.23

other drugs for women for the period of 1969-1991. Her analysis indicated that cerebral vascular stroke was the most common event for PPA-containing products; that such events were also evident in cough-cold preparations; and that such events were often associated with first use of PPA products. Despite this information, consumers were not being timely or adequately warned by the pharmaceutical industry about the then-known association between PPA and stroke.

36.   In 1991, the FDA held a public meeting to address the issues regarding safety and effectiveness of PPA before publishing a final monograph for the drug. Reports of hemorrhagic strokes associated with PPA use were discussed at the meeting.

37.   Between 1991 and 2000, the FDA received an additional 22 reports of hemorrhagic strokes associated with PPA use. Four of these consumers died of their stroke injuries.

38.   Although most of the attention has been directed to the association between PPA and hemorrhagic strokes, there have been numerous case reports of heart attacks, lacunar infarcts, infarcts of cerebral arteries, and ischemic events associated with the use of PPA. The same mechanism, PPA causing severe hypertension and direct vasoconstriction of the blood vessels, which causes hemorrhagic strokes and ruptured aneurysms, causes these ischemic events and heart attacks.

39.   Thus, by the time each of the Plaintiffs ingested Dexatrim, numerous reports of PPA-related serious health problems including hemorrhagic stroke, ischemic stroke, hypertension and neurological and cardiac symptoms and problems, had been made to the FDA and knowledge of that information and the reasons why PPA should be removed from the marketplace were well known, or should have been, to the Defendants. These numerous adverse reports and the ongoing Yale Study, infra, were known, or should have been known, to the

(THU) 04. 25' 02 14:48/ST. 14:40/NO. 3561291355 P 12/28

FROM

Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 6689 * Pg 24/53
MAY 06 2002   4:23 PM FR KAYE SCHOLER LLP  52 836 6689 TO 5171322861384555 P.24

Defendants, however, said Defendants persisted in the distribution, marketing and sale of the Dexatrim products and other PPA products.

### The Yale Hemorrhagic Stroke Study

40.    In March of 1993, the FDA issued a letter to the Nonprescription Drug Manufacturers Association outlining its concerns regarding the safety of PPA and informed the industry that it intended to classify PPA as a Category III drug (insufficient data to assess safety). To avoid this classification, manufacturers of PPA proposed a study, which later became known as the Yale Hemorrhagic Stroke Study, to investigate the link between PPA and strokes. While the study was ongoing, the manufacturers were able to continue selling PPA products.

41.    Subsequently, the FDA began working with PPA manufacturers and investigators at Yale University School of Medicine to design the protocol for the study, a case controlled epidemiological study to examine and quantify the risk of hemorrhagic stroke and PPA use.

42.    On December 13, 2000, in a New York Times article the FDA director of OTC drugs stated that if the Yale study had not been undertaken, "The agency probably would have decided to take PPA off the market [in 1992]."

43.    In September 1994, the Yale Study, which was funded by the pharmaceutical industry, began. The study was completed in June 1999.

44.    The Yale Study confirmed by epidemiological methodologies that the use of PPA substantially increases the risk of hemorrhagic stroke. Use of PPA in an appetite suppressant was significantly associated with the risk of hemorrhagic stroke. The "first use" of any PPA product involving "cough/cold" remedies was also associated with the risk of hemorrhagic stroke.

(THU) 04. 25. 02 14:48/ST. 14:40/NO. 3561291355 P 13/28

Fax Received @ UKHR: 05/06/2002 03:16PM  Remote ID: 212 836 wu9 * Pg 25/53
MAY 06 2002    4:24 PM FR KAYE SCHOLER LLP 52 836 8689 TO 51713228613B4555 P.25

45.    Defendants were provided with the final results of the Yale Study, at the latest, during the May 2000 meetings with the FDA, but were also aware of the existence of the study for years prior to that date and the concerns that existed in the medical/scientific community that PPA was associated with causing hemorrhagic strokes.

46.    On November 6, 2000, the summary results of the Yale Study appeared in the popular press, including the front page of the New York Times newspaper. On December 21, 2000, the study and its results were officially published as an original, lead article in the peer-reviewed New England Journal of Medicine. Its authors concluded that the Yale Study, "provides strong epidemiological evidence of the association between the use of phenylpropanolamine and the risk of hemorrhagic stroke." Walter N. Kernan et al., Phenylpropanolamine and the Risk of Hemorrhagic Stroke, 343 New Eng. J. Med. 1826, 1831 (2000).

47.    Read in conjunction with the large body of prior published medical case reports, FDA adverse event reports and related clinical observations, the Yale Study establishes by every conventional legal criteria and standard the "general causation" principle: PPA causes hemorrhagic strokes in human beings.

### The FDA Recommends PPA Be Withdrawn from the Market

48.    On October 19, 2000, members of the Non-Prescription Drugs Advisory Committee for the FDA's Center for Drug Evaluation and Research met to vote on the safety of PPA in light of the Yale Study findings. The 15-member panel voted overwhelmingly that PPA was unsafe, and recommended to the FDA that PPA be removed from the marketplace.

49.    On November 6, 2000, the FDA, in reliance upon its advisory committee and the findings of the Yale Study, officially recommended that all pharmaceutical companies

Plaintiffs' Original Petition                                                    Page 13

FEB.25.2002 4:15PM INC                    4230210345              P.11/30  F-214

*provider or pharmacist to see whether their prescription cough-cold or nasal decongestant product contains phenylpropanolamine. We advise consumers to discuss alternative over-the-counter and prescription products with their health care providers or pharmacists.*

51.   FDA analysts, relying upon the Yale Study, estimate that 200-500 strokes occur per year in United States women age 18-49 resulting from ingestion of PPA products.

52.   The FDA has concluded after internal and independent analysis that the Yale Study was "carefully designed," "conducted with great attention to detail," and constitutes a "careful analysis." Moreover, the FDA has confirmed the major findings of the Yale Study by conducting its own analysis of the epidemiological data. The FDA has concluded that the Yale Study "strongly supports" their working hypothesis: PPA use increases the risk of hemorrhagic stroke. Indeed, the FDA has concluded that the Yale Study results largely fulfill the criteria needed to establish "causality."

**Defendants' Knowledge About PPA and the Risk of Hemorrhagic Stroke**

53.   Defendants knew or should have known, about the decades-long history of case reports in the published medical literature establishing a meaningful clinical/medical association between PPA and risk of stroke, as well as from the fifty-plus adverse event reports filed with the FDA, as well as numerous adverse reports from the Company's own internal safety surveillance database, all of which related to strokes arising from PPA exposure.

54.   Defendants also were and are fully aware of the significant underreporting of adverse events associated with OTC drugs in spontaneous safety surveillance systems, such as that at the FDA regarding PPA and strokes. The FDA has estimated that as few as 1% of all PPA-associated adverse events have been reported. Utilizing that learned estimate, the 44 FDA adverse reports between 1969 and 2000 which arose from cases of hemorrhagic stroke associated with PPA use, would translate into 4400 such cases over the years in question.

Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 27/53
MAY 06 2002   4:24 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.27

55.    Defendants used PPA in their products due to its efficacy as an appetite suppressant. However at the same time, PPA also works to constrict blood vessels in the brain and heart. The process of constricting blood vessels raises blood pressure and causes severe hypertension. When blood pressure is raised to a critical level it increases the likelihood of severe life threatening and often fatal effects including but not limited to heart attack and stroke.

56.    Defendants were aware or should have been aware of the evidence relating PPA to potentially life threatening and fatal reactions.

57.    In addition to studies conducted by the FDA and the scientific community, Defendants separately and through trade organizations have engaged in collecting data and information tending to demonstrate the connection between PPA and serious adverse health effects.

58.    At all times material, manufacturing Defendants were members of the Consumer Healthcare Products Association ("CHPA") (f/k/a Non-Prescription Drug Manufacturers Association ("NDMA")). A function of the CHPA is to provide information to its members concerning issues of importance to the industry. As a member of the CHPA, Defendants participated in numerous communications and discussions directly related to the safety and known adverse health effects of products containing PPA.

59.    CHPA set up a PPA Task Force whose objective was, among other things, to study the adverse effects of PPA and to address concerns of the scientific and medical communities with respect to PPA. In working to fulfill its mission, CHPA's Task Force collected information from the medical and scientific communities. Defendants, by and through CHPA and the PPA Task Force, reviewed the collected medical and scientific literature regarding products containing PPA. As such, Defendants were fully aware of the numerous articles,

(THU) 04. 25' 02 14:49/ST. 14:40/NO. 3561291355 P 17/23

Fax Received @ UHR: 05/06/2002 03:16PM  Remote ID: 212 836 6689 * Pg 28/53
MAY 06 2002   4:25 PM FR KAYE SCHOLER LLP 52 836 6689 TO 5171322861384555 P.28

treatises, reports and other evidence relating to the association between PPA and adverse health effects including stroke, heart attack, arrhythmias and death.

60.    Despite Defendants' knowledge concerning the adverse effects of PPA, Defendants continued to manufacture, market, advertise, distribute, and sell products containing PPA. Defendants promoted PPA products as safe and effective with little or no side effects. In addition, Defendants made no efforts to warn the general public of the dangers associated with PPA nor did Defendants take any steps to alert the medical community and inform them of the significant risks associated with PPA.

61.    To the contrary, Defendants actively engaged in downplaying and minimizing any potential adverse side effects associated with the consumption of PPA. Defendants represented to the general public and to the medical community that PPA products were safe for human consumption. Defendants concealed from the general public that PPA in OTC products could cause stroke, heart attack, heart arrhythmias and death.

62.    Defendants knew or should have known that the general public considered over-the-counter medications, like the Dexatrim products to be innocuous because of their ready availability without a prescription. The perception of the public relating to the safety of such over-the-counter drugs only increased the likelihood of serious adverse health consequences associated with the consumption of PPA.

63.    Defendants failed to sufficiently test PPA products prior to marketing and selling them to the general public. The tests and studies performed by Defendants on PPA products lacked validity in that Defendants failed to test PPA products and their effects on the cardiovascular and central nervous systems over a reasonable period of time before and during the distribution and sale of the PPA products to the public. Nevertheless, Defendants represented

(THU) 04. 25. 02 14:50/ST. 14:40/NO. 3561291355 P 18/28                    FROM

Fax Received @ uxHR: 05/06/2002 03:16PM Remote ID: 212 836 uu89 * Pg 29/53
MAY 06 2002   4:25 PM FR KAYE SCHOLER LLP 52 836 6689 TO 5171322861384555 P.29

PPA products as pharmaceutically tested and safe for consumption, placing the general population at risk of severe adverse health effects including stroke, heart attack, heart arrhythmias and death.

64.   Based upon Defendants' marketing, advertising, promotion and representation of products containing PPA as being safe and effective, Plaintiffs purchased and ingested Defendants' products containing PPA.   However, Defendants' products were not safe as marketed, advertised, promoted and represented by Defendants in that Defendants knew or should have known that PPA products could cause stroke, heart attack, heart arrhythmias and death.   Defendants failed to warn Plaintiffs that ingesting medicines that contain PPA may result in a stroke.

65.   Throughout the time period that Defendants manufactured, offered, distributed, marketed and sold products containing PPA, they have been aware of the health risk and adverse effects of PPA.   Defendants have concealed this information from Plaintiffs and from the general public.   Plaintiffs did not discover and could not have discovered this information absent Defendants' disclosure.   Because of the intentional conduct of the Defendants and the pharmaceutical industry to conceal important information about the dangerous risks of PPA medications, the information was not known to Plaintiffs.   Plaintiffs have just now learned of some of these risks.

66.   Plaintiffs first learned of the dangers of ingesting medications containing PPA, when they saw it in the general media, after November 6, 2000.   It was only after seeing numerous press releases about the medications which contain PPA, and listings of the medicines containing PPA, and information that it was associated with strokes, that Plaintiffs knew of the dangers of the drug and what caused the injuries.   But for the news media publishing the dangers

82/28 d SSE1621965E .ON/OD:D1 .TS/OD:D1 20 .52 .DD(UHT)

Fax Received @ DXHR: 05/06/2002 03:16PM  Remote ID: 212 836 0089 * Pg 30/53
MAY 06 2002   4:25 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.30

of PPA, they would not have known of these facts, and could not and would not have known that the ingestion of PPA caused their injuries.

## COUNT ONE
## FAILURE TO WARN

67.    Plaintiffs incorporate by reference the facts and allegations contained hereinabove.

68.    Dexatrim products were defective and unreasonably dangerous when these products left possession of the Defendants in that they contained warnings insufficient to alert Plaintiffs to the dangerous risks and reactions associated with the medicine, including, but not limited to stroke and death.

69.    Plaintiffs used the medicine for its intended purpose, i.e., as an appetite suppressant and could not have discovered any defect in the drug products through the exercise of reasonable care.

70.    Defendants, as manufacturers and distributors of pharmaceutical drugs, are held to the level of knowledge of experts in the field, and further, Defendants had knowledge of the dangerous risks and side effects of the products. Plaintiffs did not have the same knowledge as Defendants and no adequate warning were communicated to them.

71.    Defendants had a continuing duty to warn consumers of their products, including Plaintiffs, of the dangers associated with the products, and by negligently and/or wantonly failing to adequately warn of the danger of use of the PPA products in question, Defendants breached their duty.

72.    As a direct and proximate result of the Defendants' failure to warn, Plaintiffs suffered serious and permanent injuries as outlined below. As a direct and proximate result of the actions and conduct of Defendants, Plaintiffs have each, individually, suffered damages in an

(THU) 04. 25' 02  14:50/ST. 14:40/NO. 3561281855 P 20/28

MAY 06 2002   4:25 PM FR KAYE SCHOLER LLP 52 836 8689 TO 51713228613845555 P.31
Fax Received @ uxHR: 05/06/2002 03:16PM   Remote ID: 212 836 ω89 * Pg 31/53

amount which exceeds the minimum jurisdictional limits of this Court, and for which each
Plaintiff now sues.

## COUNT TWO
## BREACH OF WARRANTY OF MERCHANTABILITY

73.    Plaintiffs incorporate by reference the facts and allegations set out hereinabove.

74.    When Defendants placed the Dexatrim products into the stream of commerce,
they knew of the use for which the medicine was intended, as an appetite suppressant available
over the counter, and expressly and impliedly warranted to Plaintiffs and other users of the
product that use of these products were a safe and acceptable means of weight control.

75.    Plaintiffs reasonably relied upon the expertise, skill, judgment and knowledge of
the Defendants and upon the express and/or implied warranty that the Dexatrim products were of
merchantable quality and fit for use as an appetite suppressant and weight control.

76.    The Dexatrim products were not of merchantable quality and were not safe or fit
for their intended use because they were and continue to be unreasonably dangerous and unfit for
the ordinary purposes for which they are used, in that they caused strokes, brain hemorrhages,
and ischemic events.  The products breached the warranties because they were unduly dangerous
in expected use and did cause undue injury and harm to the Plaintiffs.

77.    As a direct and proximate result of the actions and conduct of the Defendant,
Plaintiffs suffered actual, incidental and consequential damages under Tex. Bus. & Com. Code §
2.715 in an amount which exceeds the minimum jurisdictional limits of this Court, and for which
each Plaintiff now sues.

## COUNT THREE
## NEGLIGENCE

78.    Plaintiffs incorporate by reference the facts and allegations set out hereinabove.

(THU) 04. 25. 02 14:51/ST. 14:40/NO. 3561291355 P 21/28

(THU) 04. 25. 02 14:51/ST. 14:40/NO. 3561291355 P 22/28

Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 oo89 * Pg 32/53
MAY 06 2002  4:26 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.32

voluntarily remove PPA from their products. By correspondence of the same date, the FDA urged all manufacturers and sellers of OTC products containing PPA to cease immediately the distribution and sale of said products.

50.    On the same day, the FDA's Nonprescription Drugs Advisory Committee issued the following advisory:

Food and Drug Administration
Public Health Advisory
Subject: Safety of Phenylpropanolamine
November 6, 2000

*The Food and Drug Administration (FDA) is issuing a public health advisory concerning phenylpropanolamine hydrochloride. This drug is widely used as a nasal decongestant (in over-the-counter and prescription drug products) and for weight control (in over-the-counter drug products). FDA is taking steps to remove phenylpropanolamine from all drug products and has requested that all drug companies discontinue marketing products containing phenylpropanolamine.*

*Phenylpropanolamine has been marketed for many years. A recent study reported that taking phenylpropanolamine increases the risk of hemorrhagic stroke (bleeding into the brain or into tissue surrounding the brain) in women. Men may also be at risk. Although the risk of hemorrhagic stroke is very low, FDA recommends that consumers not use any products that contain phenylpropanolamine.*

*FDA's Nonprescription Drugs Advisory Committee (NDAC) recently discussed this study and other information on phenylpropanolamine. NDAC determined that there is an association between phenylpropanolamine and hemorrhagic stroke and recommended that phenylpropanolamine not be considered safe for over-the-counter use.*

*Although this risk of hemorrhagic stroke is very low, FDA has significant concerns because of the seriousness of a stroke and the inability to predict who is at risk. FDA does not consider the conditions for which phenylpropanolamine is used (over-the-counter or by prescription) as justifying the risk of this serious event. Other products are available for use.*

*In the meantime, consumers can identify over-the-counter cough-cold, nasal decongestant, and weight control products containing this ingredient by looking for "phenylpropanolamine" in the list of active ingredients on the label. Consumers can check with their health care*

(THU)04.25'02 14:49/ST.14:40/NO.3561291355 P 15/28

MAY 06 2002   4:26 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.33
Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 0089 * Pg 33/53

hemorrhagic stroke, ischemic events and other serious side effects, from the use of PPA products;

f.   Were otherwise careless or negligent.

81.   Defendants knew or should have known that PPA products caused unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware. Defendants nevertheless advertised, marketed, sold and distributed the product knowing that there were safer methods and products for weight control and appetite suppression.

82.   As a direct and proximate result of the actions and conduct of Defendants, Plaintiffs have each suffered damages in an amount which exceeds the minimum jurisdictional limits of this Court, and for which each Plaintiff now sues.

## COUNT FOUR
## GROSS NEGLIGENCE

83.   Plaintiffs incorporate by reference the facts and allegations set out hereinabove.

84.   Defendants, directly or indirectly, maliciously and wantonly manufactured, designed, tested, labeled, supplied, packaged, distributed, promoted, marketed, advertised, warned, failed to warn and/or sold, in the state of Texas, Dexatrim products containing PPA.

85.   At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, testing, labeling, assembling, packaging, distribution, promotion and sale of products containing PPA. Despite the knowledge of serious life threatening consequences, Defendants knowingly marketed and sold their PPA products.

86.   Defendants breached their duty and were wanton and malicious in their actions, misrepresentations, and omissions toward each of the Plaintiffs in the following ways:

(THU) 04.25.02 14:51/ST. 14:40/NO. 3561291355 P 23/28

Fax Received a URHR: 05/06/2002 03:16PM  Remote ID: 212 836 6o89 * Pg 34/53
MAY 06 2002    4:26 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555  P.34

FEB. 25 2002  4:17PM INC                          4123021096              749  P.75/78  F-334

a.  Knowingly and maliciously omitted adequate warnings with the product
that would alert Plaintiffs and other consumers to the potential risks and
serious side effects of the products;

b.  Knowingly and maliciously omitted adequate and proper tests for the
products before placing them on the market;

c.  Knowingly and maliciously omitted sufficient testing on the products
which, if properly performed, would have shown that the products had
serious side effects, including, but not limited to, risk of hemorrhagic
stroke, ischemic stroke and death;

d.  Knowingly and maliciously failed to adequately warn Plaintiffs that use of
the products carried a risk of disability and death due to stroke and other
serious side effects;

e.  Knowingly and maliciously failed to provide adequate post-marketing
warnings or instructions after the Defendants knew or should have known
of the significant risks of stroke, injury and death from the use of the
product;

87.  Defendants had objective and subjective knowledge that the product caused
unreasonably dangerous risks and serious side effects of which Plaintiffs would not be aware.
Defendants nevertheless maliciously and recklessly advertised, marketed, sold and distributed
the products knowing that there were safer methods and products for weight control and appetite
suppression.

88.  As a direct and proximate result of the actions and conduct of Defendants, each
Plaintiff has suffered serious actual damages in an amount which exceed the minimum

(THU) 04. 25' 02 14:51/ST. 14:40/NO. 3561291355 P 24/28

* KOM

MAY 06 2002    4:27 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.35
Fax Received @ UxHR: 05/06/2002 03:16PM  Remote ID: 212 836 8o89 * Pg 35/53

jurisdictional limits of this Court. The actions of Defendants are of such a nature that this Court should not only award actual damages but should also ask the jury to award exemplary damages by way of punishment.

## COUNT FIVE
## FRAUD, MISREPRESENTATION AND SUPPRESSION

89.    Plaintiffs incorporate by reference the facts and allegations set out hereinabove.

90.    Defendants fraudulently, intentionally and/or negligently misrepresented to Plaintiffs, the FDA, and general public, the safety and effectiveness of PPA products and/or fraudulently, intentionally and/or negligently concealed material including adverse information regarding the safety and effectiveness of PPA.

91.    Defendants made misrepresentations and actively concealed adverse information at a time when the Defendants knew, or should have known, that PPA had defects, dangers, and characteristics that were other than what the Defendants had represented to the FDA, and the consuming public, including Plaintiffs. Specifically, the Defendants misrepresented to and/or actively concealed from Plaintiffs, the FDA, and the consuming public that:

   a.    Products containing PPA had serious side effects such as strokes, heart attack and death;

   b.    There had been insufficient studies regarding the safety and efficacy of the PPA products;

   c.    The products containing PPA, and PPA itself, were never fully and adequately tested;

   d.    Prior studies, research, reports and/or testing had been conducted linking the use of PPA products to serious adverse reactions, including, but not limited to, stroke, heart attack and death;

(THU) 04. 25. 02 14:52/ST. 14:40/NO. 3561291355 P 25/28

c.   There was a greatly increased risk of stroke and hypertension associated with the use of the PPA products.

92.   The misrepresentations of and/or active concealment alleged above were perpetrated directly and/or indirectly by the Defendants. Defendants knew or should have known that these representations were false and made the representations with the intent or purpose that Plaintiffs would rely on them, leading to the use of PPA by them. Defendants knew that Dexatrim was sold without a prescription, and without the direct aid and advice of a physician, and that Plaintiffs would be relying on information, advertisements and statements made by Defendants about the use, safety and efficacy of these PPA products.

93.   At the time of Defendants' fraudulent misrepresentations, Plaintiffs were unaware of the falsity of the statements being made and believed them to be true. Plaintiffs further had no knowledge of the information concealed and/or suppressed by Defendants. Plaintiffs justifiably relied on and/or were induced by the misrepresentations and/or active concealment and relied on the absence of safety information which the Defendants did suppress, conceal or fail to disclose to Plaintiffs detriment.

94.   Defendants had a post-sale duty to warn Plaintiffs and the public about the potential risks and complications associated with products containing PPA in a timely manner. The misrepresentations and active fraudulent concealment by the Defendants constitutes a continuing tort against Plaintiffs and other persons who ingested these PPA products.

95.   Defendants made the misrepresentations and actively concealed information about the defects and dangers of the products with the intention and specific desire that the Plaintiffs and the consuming public would rely on such or the absence of information in selecting the drug as an appetite suppressant.

Plaintiffs' Original Petition                                                    Page 25

Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 oo89 * Pg 37/53
MAY 06 2002   4:27 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555  P.37

FEB.25.2002       4:18PM                    +41502125           X-748  P.28/30  F-234 

96.    As a direct and proximate result of the actions and conduct of Defendants,
Plaintiffs have each suffered damages in an amount which exceeds the minimum jurisdictional
limits of this Court, and for which each Plaintiff now sues.

## DAMAGES

97.    As a direct producing and proximate result of the actions and conduct of these
Defendants as set forth above, Plaintiffs, each of them individually, have sustained injuries and,
under Texas Law, are entitled to at least the following damages:

    a.    Reasonable and necessary health care expenses incurred in the past;

    b.    Reasonable and necessary health care expenses which, in all reasonable
          probability, will be incurred in the future;

    c.    Physical pain and suffering in the past;

    d.    Physical pain and suffering which, in all reasonable probability, will be endured
          in the future;

    e.    Mental anguish suffered in the past;

    f.    Mental anguish which, in all reasonable probability, will be suffered in the future;

    g.    Physical disability/impairment, past and future;

    h.    Lost wages in the past and future loss of wage earning capacity; and

    i.    All other incidental and consequential damages, fees and expenses.

For each of the above, Plaintiffs, individually, seek compensatory damages in an amount
in excess of the minimum jurisdictional limits of the Court, for which amount Plaintiffs now sue.

    **WHEREFORE, PREMISES CONSIDERED,** Plaintiffs prays that Defendants be cited
to appear and answer herein; that upon jury trial hereof, Plaintiffs will have Judgment against
Defendants for all damages sustained by Plaintiffs; for an award of exemplary and punitive

(THU) 04. 25. 02 14:52/ST. 14:40/NO. 3561291355 P 27/28

Fax Received a υκHR: 05/06/2002 03:16PM  Remote ID: 212 836 oo89 * Pg 38/53
MAY 06 2002  4:27 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.38

79.    Defendants, directly or indirectly, negligently manufactured, designed, tested, labeled, packaged, distributed, promoted, marketed, advertised, and sold, in the state of Texas, Dexanim products, containing the drug PPA.

80.    At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable care in the design, manufacture, testing, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of their products containing PPA. Defendants breached their duty and were negligent in their actions, misrepresentations, and omissions toward Plaintiffs in the following ways:

   a.    Failed to include adequate warnings with the medications that would alert Plaintiffs and other consumers to the potential risks and serious side effects of the PPA products;

   b.    Failed to use due care in designing and manufacturing this pharmaceutical so as to avoid the aforementioned risks to individuals when this pharmaceutical was being sold, consumed, ingested and/or used for management of weight control;

   c.    Failed to conduct adequate and sufficient pre-clinical and clinical testing and post market surveillance to determine the safety and efficacy of the appetite suppressants containing PPA;

   d.    Failed to adequately warn Plaintiffs that use of the PPA products was more dangerous than they believed, and that the products carried a risk of death due to stroke;

   e.    Failed to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks of

(THU) 04. 25. 02 14:51/ST. 14:40/NO. 3561291355 P 22/28

Fax Received @ UKHR: 05/06/2002 03:16PM  Remote ID: 212 836 6089 * Pg 39/53
MAY 06 2002  4:28 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.39

FEB.25.2002 4:18PM INC                    NO.555  P.29
                                          P.28/30  F-534

damages as may be determined by the trier of fact; for all costs of court; for pre-judgment and post-judgment interest at the highest legal rate; and for such other and further relief, general and special, at law and in equity; to which Plaintiffs may show themselves to be justly entitled.

## LOSS OF CONSORTIUM

98.    Plaintiff, Ever Hinojosa, incorporates by reference the facts and allegations set forth hereinabove.

99.    As a direct and proximate consequence of the damages suffered by his wife, Teresa Hinojosa, as a result of the above actions and inactions of the Defendants, he was caused to lose the companionship and services of his wife. He suffered injuries and damages; including:

a.    Loss of the companionship and services of his wife.

b.    His own mental anguish and suffering, past and future.

WHEREFORE, PREMISES CONSIDERED, Plaintiff, Ever Hinojosa, prays that Defendants be cited to appear and answer herein; that upon jury trial hereof, Plaintiff will have Judgment against Defendants for all damages sustained by Plaintiff; and for such other and further relief, general and special, at law and in equity, to which Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

Respectfully submitted,

WAYNE WRIGHT LLP
5707 IH-10 West, Suite 101
San Antonio, Texas 78201
Telephone: (210) 734-7077
Facsimile: (210) 734-9965

By: _____
    Richard W. Hunnicutt, III
    State Bar No. 10279700

Plaintiffs' Original Petition                               Page 27

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 40/53
MAY 06 2002   4:28 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.40

**RECEIVED**

MAR 1 9 2002

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
              DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

ANGELITA DILLE, ET AL

VS.

THE DELACO COMPANY,
ET AL

§
§
§
§
§
§
§
§

**SA 02 CA 0274**

CIVIL ACTION NO. _____

**DKT-IV**

JURY DEMANDED

## NOTICE OF REMOVAL

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW CHATTEM, INC., one of the Defendants in the above-captioned

cause ("Chattem"), and files this Notice of Removal and would respectfully show the Court

the following:

### I.

On February 11, 2002, an action was filed in the 150th District Court of Bexar County,

Texas, Cause No. 2002-CI-02108, styled "*Angelita Dille, et al v. The Delaco Company f/k/a

Thompson Medical Company, Inc., Chattem, Inc., et al*" (hereinafter referred to as "state

court action"). A true and correct copy of Plaintiffs' Original Petition and Citation is

attached hereto as Exhibit "A" and incorporated herein by reference.

### II.

On February 25, 2002, Chattem was served with Plaintiffs' Original Petition and

Citation and filed its Motion to Transfer Venue, Original Answer and Special Exceptions in

3CTB.1

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 41/53
MAY 06 2002  4:28 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555  P.41

the state court action on March 14, 2002. A true and correct copy of Defendant Chattem's Original Answer is attached hereto as Exhibit "B" and incorporated herein by reference.

## III.

The documents attached hereto as Exhibits "A" and "B" comprise true and correct copies of all executed process and pleadings asserting causes of action and all answers to such pleadings filed in the state court action.

## IV.

The state court action is a suit brought by Plaintiffs to recover damages for injuries which they allegedly sustained as a result of their ingestion of Dexatrim, a non-prescription appetite suppressant containing phenylpropanolamine (hereinafter referred to as "PPA"), which Plaintiffs allege to be associated with serious injuries such as hemorrhagic strokes, ischemic strokes and ruptured aneurysms. Plaintiffs allege that the Defendants are liable to them for failure to warn, breach of the warranty of merchantability, negligence, gross negligence, fraud, misrepresentation and suppression.

## V.

The state court action is one over which this Court has original jurisdiction under the provisions of 28 U.S.C. §1332, and is one which may be removed to this Court by Defendant Chattem pursuant to the provisions of 28 U.S.C. §1441, in that it is a civil action wherein the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

(THU)04. 25. 02 12:57/ST. 12:50/NO. 3560129135I P 26

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 42/53
MAY 06 2002  4:29 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.42

As shown by paragraphs 1-6, Plaintiffs, at the time this action was commenced, were, and still are alleged to be, citizens of the State of Texas.

Defendant THE DELACO COMPANY, SUCCESSOR BY MERGER TO THOMPSON MEDICAL COMPANY, INC., at the time this action was commenced, was, and still is a corporation organized under the laws of the State of Delaware with its principal place of business in the State of Delaware.

Defendant CHATTEM, at the time this action was commenced, was, and still is, a corporation incorporated under the laws of the State of Tennessee with its principal place of business in Tennessee.

Defendant H.E. BUTT GROCERY COMPANY individually and d/b/a HEB, d/b/a HEB RX EXPRESS, d/b/a HEB CENTRAL MARKET, d/b/a HEB FOOD STORES, and d/b/a HEB MARKETPLACE ("HEB") is alleged to be a Texas corporation with its principal place of business in Bexar County, Texas. Defendant COLEMAN PHARMACY is alleged to be a Texas business with its principal place of business in Webb County, Texas. However, Chattem alleges and will show that Defendants HEB and Coleman Pharmacy have been fraudulently joined as defendants for the purpose of defeating diversity jurisdiction. Specifically, there is no reasonable basis for predicting that Plaintiffs might establish liability against HEB or Coleman Pharmacy.

3

(THU)04, 25' 02 12:57/ST, 12:50/NO, 8561291351 P 27

More specifically, Plaintiffs have not alleged that HEB or Coleman Pharmacy actually sold or supplied Dexatrim to them. In the absence of such an allegation, Plaintiffs' Complaint does not link their alleged injuries with the action (or inaction) of these Defendants. As such, Plaintiffs' Original Petition states no cause of action against Defendants HEB and Coleman.

Further, the Plaintiffs' allegations are made against the "Defendants," collectively, and do not state any specific acts or omissions on the part of HEB or Coleman Pharmacy. Moreover, under Texas law, pharmacists are not liable for failing to warn of the risks of medications. This limitation on liability for pharmacies logically extends to over-the-counter medications, for which pharmacies have even less direct responsibility than for prescription medications. In short, there is no reasonable basis for predicting that the Plaintiffs might establish liability against either HEB or Coleman Pharmacy. See *Badon v. RJR Nabisco, Inc.*, 224 F.3d 382, 392 (5th Cir. 2000); *Wiggins v. American Home Products Corp.*, Case No. CV-01-J-2303-NW (N.D.Ala.2001) (copy attached hereto as Exhibit "C") (holding that in-state drug store from which plaintiff purchased over-the-counter medication containing PPA was fraudulently joined to suit against manufacturer).

## VI.

According to the records of the District Clerk of Bexar County, no other Defendants have yet been served with citation in the state court action.

## VII.

5427871

4

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 44/53
MAY 06 2002  4:29 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.44

Removal is timely. The first date upon which any of the Defendants was served with Plaintiffs' Original Petition was February 25, 2002, less than thirty days before this removal notice. See 28 U.S.C. §1446(b).

## VIII.

This is a statutorily proper venue under the provisions of 28 U.S.C. §1441(a) because this district and division embrace the place where the removed action has been pending.

## IX.

As verified by the attorney for Defendant Chattem, Inc., a copy of this Notice of Removal will be promptly filed with the Bexar County District Clerk's Office and a copy of all processes, pleadings and orders has been filed separately with this Court pursuant to 28 U.S.C.§1446(a).

Respectfully submitted,

HAYS, McCONN, RICE & PICKERING

By: _____
Margaret T. Brenner
State Bar No. 02958050

ATTORNEY-IN-CHARGE FOR DEFENDANT
CHATTEM, INC.

OF COUNSEL:

HAYS, McCONN, RICE & PICKERING, P.C.
Craig S. Wolcott
State Bar No. 21845475
400 Two Allen Center
1200 Smith Street

5

(THU)04. 25' 02 12:58/ST. 12:50/NO. 3561291351 P 29

Fax Received @ DXHR: 05/06/2002 03:16PM  Remote ID: 212 836 8o89 * Pg 45/53
MAY 06 2002   4:29 PM FR KAYE SCHOLER LLP 52 836  8689 TO 5171322961384555 P.45

Houston, Texas 77002
Telephone:    (713) 654-1111
Facsimile:    (713) 655-9212

Fax Received @ DRHR: 05/06/2002 03:16PM Remote ID: 212 836 8689 * Pg 46/53
MAY 06 2002   4:29 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.46

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly sent by U. S. mail, certified mail return receipt requested, hand delivery, or by telecopy, on this 14ᵗʰ day of March, 2002 to the following counsel of record:

Mr. Richard Hunnicutt, III
WAYNE WRIGHT, LLP
5707 IH-10 West, Suite 101
San Antonio, Texas 78201


_____
Margaret T. Brenner

(THU) 04. 25' 02 12:58/ST. 12:50/NO. 3561291351 P 31

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 47/53
MAY 06 2002   4:30 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.47

THE STATE OF TEXAS    §
                      §
COUNTY OF HARRIS      §

## AFFIDAVIT

BEFORE ME, the undersigned authority on this day personally appeared MARGARET T. BRENNER, known to me to be the person whose name is subscribed to the foregoing instrument, who, being duly sworn, stated upon her oath that she is the attorney-in-charge for Chattem, Inc., Defendant in the above-captioned and numbered cause, that in such capacity she did prepare the foregoing Notice of Removal, and that the allegations contained therein are true and correct to the best of her information, knowledge and belief.

_____
MARGARET T. BRENNER

SUBSCRIBED AND SWORN TO BEFORE ME by the said MARGARET T. BRENNER on this ___ day of March, 2002.

EVANGELINE L. O'BRYANT
NOTARY PUBLIC
STATE OF TEXAS
COMM. EXP. 05-48-2003

_____
Notary Public in and for the State of Texas

(THU) 04. 25' 02 12:58/ST. 12:50/NO. 3561291351 P 32

Fax Received @ URHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 48/53
MAY 06 2002  4:30 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.48

# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

RECEIVED

MAR 2 8 2002

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

| | | |
|---|---|---|
| ANGELITA DILLE, ET AL | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. SA 02 CA0274 |
| | § | |
| THE DELACO COMPANY, | § | |
| ET AL | § | JURY DEMANDED |

## CHATTEM, INC.'S MOTION FOR
## TEMPORARY STAY OF PROCEEDINGS

Defendant CHATTEM, INC. (hereinafter referred to as "Chattem") by and through counsel, does hereby move for an order staying proceedings in this action until the Judicial Panel on Multidistrict Litigation acts on Chattem's notice that the action should be transferred to the Western District of Washington for inclusion in the docket in *In Re Phenylpropanolamine ("PPA") Products Liability Litigation*, MDL Docket No. 1407, 173 F. Supp.2d 1377 (J.P.M.L. 2001). Following the creation of MDL Docket in August, 2001, more than 350 pending PPA actions have been or are in the process of being transferred to the Honorable Barbara J. Rothstein of the Western District of Washington. Chattem has filed a notice of "tag-along action" and expects a response in short order.

This Motion is made on the grounds that a stay in these proceedings while the Panel is acting on Chattem's tag-along notice will conserve judicial resources and is necessary to avoid a risk of inconsistent decisions by different district courts on a court jurisdictional issue that is common to many PPA actions. Chattem anticipates that Plaintiffs will file a

Fax Received @ DXHR: 05/06/2002 03:16PM  Remote ID: 212 836 6089 * Pg 49/53
MAY 06 2002  4:30 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.49

Motion to Remand on the ground that diversity jurisdiction is lacking by reason of their having named as Defendants two retailers of PPA products which are Texas corporations. Chattem contends that these Defendants have been fraudulently joined and hence do not defeat diversity. Courts in several other districts recently have granted stays in such circumstances, so the remand motions in PPA actions can be decided by Judge Rothstein.

In support of this Motion, Chattem hereby adopts and incorporates by reference its Memorandum in Support of Motion for Temporary Stay of Proceedings Pending a Final Ruling of the Judicial Panel of Multidistrict Litigation on Transfer of this Case to MDL-1407, filed simultaneously herewith, and the following exhibits attached hereto:

A.    Conditional Transfer Order-11 issued in Docket No. 1407;

B.    Tag-Along Letter forwarded by Chattem to the MDL Panel on March 19, 2002;

C.    Order, *Dyson v. American Home Products Corp.*, No. 01-3548 (E.D. La., January 23, 2002);

D.    Order, *Craft v. Whitehall-Robins Health Care*, No. 01-3490 (E.D. La., January 23, 2002);

E.    Order, *Bobbie Gray v. Bayer Corporation, et al.*, No. 01-1761 (W.D. La., October 16, 2001);

F.    Report and Recommendation, *James Bowman v. Bayer Corporation, et al.*, No. 01-1802-A (W.D. La., October 16, 2001);

G.    Report and Recommendation, *Monk v. Bayer Corp.*, No. 01-1760-A (W.D. La.);

H.    Report and Recommendation, *Tamika McFee v. Bayer Corporation, et al.*, No. 01-1820-M (W.D. La.);

I.    Order, *Shirley J. Drayton v. Novartis Consumer Health, Inc.*, et al., No. 5: 01-CV-265 (S.D. Miss., October 4, 2001);

2

Fax Received @ DKHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 50/53
MAY 06 2002  4:30 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555  P.50

J.    Order, *Shubin v. American Home Products*, No. ED-CV-02-15 (C.D. Cal., February 13, 2002);

K.    Copies of Orders in 62 Louisiana federal district court cases that have been stayed where a plaintiff's Motion to Remand was pending;

L.    Order, *Dueul v. Ethex Corp.*, No. C01-1879 (W.D. Wash., January 31, 2002);

M.    Order, *Johnson v. Bayer Corp.*, No. C01-2014R (W.D. Wash., February 26, 2002);

N.    Order, *Jones v. Bayer Corp.*, No. C01-2018R (W.D. Wash., February 26, 2002).

For the reasons detailed in the attached Memorandum, Chattem moves this Court to temporarily stay all proceedings in this matter pending a final ruling of the Judicial Panel on Multidistrict Litigation on Transfer of This Case to MDL-1407. The stay will further the cause of judicial efficiency and consistency by avoiding duplicative proceedings and conflicting pretrial rulings. Furthermore, it will not prejudice the parties, but rather will benefit both them and the Court.

Respectfully submitted,

HAYS, McCONN, RICE & PICKERING, P.C.

By: _Margaret B_

Margaret T. Bremer
State Bar No. 02958050

ATTORNEY-IN-CHARGE FOR CHATTEM, INC.

OF COUNSEL:
HAYS, McCONN, RICE & PICKERING, P.C.
1200 Smith, Suite 400
Houston, TX 77002
Telephone:    713/654-1111
Facsimile:    713/650-0027

3

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 51/53
MAY 06 2002  4:31 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861384555 P.51

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been duly sent by U. S. mail, certified mail return receipt requested, hand delivery, or by telecopy, on this 28th day of March, 2002 to the following counsel of record:

Mr. Richard Hunnicutt, III
WAYNE WRIGHT, LLP
5707 IH-10 West, Suite 101
San Antonio, Texas 78201

Margaret T. Brenner

4

Fax Received @ DRHR: 05/06/2002 03:16PM  Remote ID: 212 836 8689 * Pg 52/53
MAY 06 2002  4:31 PM FR KAYE SCHOLER LLP 52 836 8689 TO 5171322861304555 P.52

**FILED**

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

APR 1 5 2002

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

ANGELITA DILLE, ET AL                  §
                                       §
VS.                                    §
                                       §    CIVIL ACTION NO. SA 02 CA0274
THE DELACO COMPANY,                    §
ET AL                                  §    JURY DEMAND **DKT-IV**

## ORDER

On this day came on to be considered the Motion of Defendant Chattem, Inc. for a Temporary Stay of Proceedings in this action until the Judicial Panel on Multidistrict Litigation acts on Chattem's Notice that the action should be transferred to the Western District of Washington for inclusion in the docket in *In Re Phenylpropanolamine ("PPA") Products Liability Litigation*, MDL Docket No. 1407; and the Court, having considered Defendant's Motion, is of the opinion and finds that same should be granted. It is, therefore,

ORDERED that the Motion of Defendant Chattem, Inc. is granted and all further proceedings in this action are hereby STAYED pending a ruling of the Judicial Panel on Multidistrict Litigation on Chattem Inc.'s request that the action be transferred to the Western District of Washington.

Signed the _15_ day of April, 2002.

_____
United States District Judge

45266.1

4



UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
ENTERED

APR 2 6 2002

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DEBRA K. HILTON-CAINE and her §
husband, LARRY CAINE §
                                §
v.                              §    CIVIL ACTION NO. H-02-1029
                                §
WHITEHALL-ROBINS HEALTH CARE    §
a division of AMERICAN HOME      §
PRODUCTS CORPORATION, and        §
BRISTOL-MYERS SQUIBB COMPANY    §

## ORDER

ON THIS day the Joint Motion to Stay Proceedings was presented, and the Court

after having considered this Motion, finds that it should be and is in all respects GRANTED;

and

IT IS THEREFORE ORDERED that this case is hereby stayed until such time as it

is transferred to the United States District Court for the Western District of Washington as

part of *In Re: Phenylpropanolamine (PPA) Products Liability Litigation*, MDL No. 1407.

SIGNED this 25th day of *April*, 2002.

_____
UNITED STATES DISTRICT JUDGE

ORDER - Page Solo
20-1226



